# Illinois Official Reports

## Appellate Court

---

### *In re K.M.*, 2019 IL App (1st) 172322

---

| | |
|---|---|
| Appellate Court Caption | *In re* K.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. K.M., Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-17-2322 |
| Filed | February 20, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-JD-60333; the Hon. Donna L. Cooper, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Kieran M. Wiberg, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia, and Kathryn A. Schierl, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE COBBS delivered the judgment of the court, with opinion.<br>Justices Howse and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1    Minor-respondent K.M. was adjudicated delinquent for residential burglary and sentenced to 18 months' probation. On appeal, K.M. contends that the trial court erred in denying his motion to suppress physical evidence and his custodial statement. For the reasons that follow, we reverse and remand.

¶ 2                                              I. BACKGROUND

¶ 3    On October 19, 2015, the police suspected K.M. was involved in a residential burglary and later arrested him on his porch. The State subsequently filed a three-count petition for adjudication of wardship and charged K.M. with (1) residential burglary, (2) burglary, and (3) theft of property with a value exceeding $500, including, *inter alia*, a television. K.M. filed a motion to quash his arrest and to suppress evidence seized as a result of an alleged illegal search. Testimony at the suppression hearing and trial was essentially the same and is summarized in relevant part below.

¶ 4    At the December 19, 2016, suppression hearing, Detective Grossman testified that the Sauk Village Police Department received an anonymous call on October 19, 2015, around 12:18 p.m. from an individual who reported seeing people enter the residence at 22438 Yates Avenue, with items, particularly a television.[1] The police department opened a burglary investigation. Grossman traveled to the Yates Avenue address. Upon arrival, Grossman spoke to the first responding officer, Officer Howard. Grossman and Howard conducted a search of the area surrounding the residence including the garbage cans located on the driveway and the detached garage.[2] According to Grossman, the garbage can was not covered with a lid.

¶ 5    That same afternoon, Sauk Village police received another call reporting a burglary. The caller, later identified as Frank Host, stated that he had returned home and discovered computer accessories, personal documents, and a large flat-screen television were missing. Another officer responded to the call and recorded a statement including the victim's identity and a description of the missing items.

¶ 6    After receiving notice of the call, Grossman and Howard further examined the contents of what they had observed in the garbage. According to Grossman, the garbage was full, but he could identify documents in the garbage that belonged to the victim. He further testified that he did not have to manipulate the garbage in any way to see the victim's name on the documents. The officers then returned to the garage and found items matching the description of the stolen items. They removed these items from the garage and knocked on the door of the residence. No one answered the door; however, Grossman noticed people peeking out of the window. Grossman further testified that a short time later another person arrived at the residence and then alerted the owner of the home, Africa Campbell, who arrived at the residence shortly after.[3]

---

[1]The caller called multiple times during the investigation directing the police to 22438 Yates Avenue.

[2]A third officer, Sergeant Mieczak, was also present at the residence. The record is unclear as to his involvement in the investigation because he did not testify at the hearing.

[3]The record is unclear who made contact with Africa Campbell.

¶ 7        Campbell identified herself, and the officers explained their presence at her house. Campbell then entered the home. She returned to the outside carrying a large flat-screen television. She also brought outside K.M. and two other individuals from inside the house. Grossman testified that they then arrested K.M. "[b]ased on the totality of the circumstances, the residential burglary report that [they] had, the description provided by the anonymous caller, and the items recovered." At no point did the officers obtain a search warrant or an arrest warrant.

¶ 8        Officer Howard testified that at approximately 12:14 p.m. on October 19, 2015, he responded to a dispatch call that took him to 22438 Yates. Upon arrival, he waited for backup. It was relayed to him that that the officers on the scene were to search for individuals.[4] In the process of their search they received another call from dispatch about a man reporting a burglary. Officer Howard's sergeant spoke with Frank Host, the victim of the burglary, and determined that the items taken were documents including a passport, bank statements, a black television, a black laptop, and a black external hard drive. With this new information, Howard and the other officers walked up the driveway toward the back and the side of the residence. Howard saw a garbage can with a black box on top of the garbage can. He opened the black box and found the victim's passport and documents with the victim's address inside the black box.

¶ 9        After searching the garbage can, Howard went to the detached garage and entered through an open side door. Once inside, he spotted a black laptop with an external hard drive in the rafters of the garage. He retrieved the laptop and the hard drive before attempting to make contact with the people inside the residence. Howard did not recall how contact was attempted but further testified that the woman who occupied the residence eventually made contact with the officers. Grossman then relayed "the case status and what was going on" to the woman. She responded by going inside the front door of the residence. Howard and the officers stayed outside and never went into Campbell's home.

¶ 10       Howard testified that Campbell reappeared holding a large flat-screen television, which she turned over to the officers. The television matched Host's description of his missing television. Howard made an in-court identification of K.M. and further testified that K.M. matched the description of the possible burglars of the victim's home. On cross-examination, Howard testified that while searching the garbage and the garage he did not see anyone enter or leave the residence.

¶ 11       Campbell testified as follows. She is K.M.'s mother, and on October 19, 2015, she lived at 22438 Yates. She lived with her brother, six children, and her niece. Her yard was fully enclosed by a fence, including the garage and the area next to the driveway where her garbage cans are located. When the police first arrived at her home, she was in South Holland that morning with her friend. Grossman spoke with her over the phone, and he stated that there were burglary suspects inside of her home and told her to come home in 10 to 15 minutes or else he would kick in her door. When she arrived, she spoke with the officers outside of her home but she denied giving the officers consent to search her property.

¶ 12       At the conclusion of the hearing, the motion to suppress was allowed in part and denied in part. The court stated:

_____

[4]The record is unclear who gave Howard these instructions.

"So as to the portion as to the garbage can and what was seen in the garage I'll grant your motion to suppress that evidence; however, we have the officer testifying that the mother comes home, they tell her what happened, she goes in the house, she brings out a TV, and then subsequently she brings out the minor. That part of the motion will not be suppressed. I'll allow that evidence as to the TV and the arrest of the minor."

¶ 13 On February 10, 2017, K.M. filed a motion for reconsideration of the court's ruling on his motion to suppress. The State agreed with the court's prior ruling that the evidence from the garbage can and the garage were properly suppressed. K.M.'s counsel argued that K.M.'s mother had been threatened and coerced by the police and therefore the television and K.M's subsequent arrest must also be suppressed. The trial court denied K.M.'s motion.

¶ 14 The testimony at trial was consistent with the testimony at the suppression hearing.[5] At trial, Grossman further testified that, after K.M.'s arrest, he spoke with K.M. at the police station. Grossman presented K.M. with a preprinted form containing *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). He read K.M. his *Miranda* warnings and observed K.M. sign the form. K.M. agreed to speak with Grossman and told him that he entered Host's house and took property.

¶ 15 The trial court adjudicated K.M. delinquent based on the residential burglary and theft charges. K.M. subsequently filed a motion "to reconsider adjudicatory findings" and for a new trial. The trial court denied K.M.'s motion for a new trial but vacated the finding of delinquency based on the theft charge. Thus, K.M. was adjudicated delinquent based on the residential burglary charge and sentenced to 18 months' probation. This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17 On appeal, K.M. argues that the trial court erred when it denied his motion to suppress both physical evidence and his custodial statement because they were obtained as a direct result of an illegal search.

¶ 18 When reviewing a lower court's ruling following a suppression hearing, the appellate court may consider both the evidence produced at the hearing and the evidence presented at the subsequent trial. *People v. Kidd*, 175 Ill. 2d 1, 25 (1996). We will not reverse the trial court's factual findings unless they are against the manifest weight of the evidence; however, we review the ultimate question of whether evidence should be suppressed *de novo*. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004).

¶ 19 The fourth amendment of the United States Constitution ensures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; see also *Elkins v. United States*, 364 U.S. 206, 213 (1960) (noting that the fourth amendment applies to state officials through the fourteenth amendment). The amendment protects individuals and not specific locations. *Pitman*, 211 Ill. 2d at 514. Accordingly, wherever an individual personally holds a reasonable expectation of privacy, that individual is entitled to be free from unreasonable government intrusion. *People v. Gherna*, 203 Ill. 2d 165, 176 (2003). "The curtilage, that is, the land immediately surrounding and associated with the home, has been considered part of the home itself for fourth amendment [purposes]." *People v. McNeal*, 175 Ill. 2d 335, 344 (1997). Therefore,

_____

[5]The trial was conducted on May 18, 2017.

"[t]he government cannot search a home and its curtilage absent a warrant or some exception to the warrant requirement." *Pitman*, 211 Ill. 2d at 518.

¶ 20   K.M. contends that his arrest was due to law enforcement's exploitation of illegally obtained evidence. Specifically, he asserts that Campbell's delivery of the television, his arrest, and his confession were fruits of an illegal search. The State does not dispute that the search of the property was an illegal search of the curtilage of the home. The State argues, however, that the arrest was proper because the officers had independent probable cause to believe that a crime had been committed by someone in the house prior to any illegal search. Alternatively, the State argues that Campbell was not induced to produce the television because of the illegally seized evidence obtained by the police.

¶ 21                              A. Independent Probable Cause

¶ 22   The State argues that the officers had independent probable cause to support K.M.'s arrest on his porch. The State posits there was enough information to satisfy the probable cause requirement because the victim's phone call corroborated the anonymous call that a burglary had occurred and K.M. matched the anonymous caller's description. K.M. responds that the anonymous call and the reported burglary are insufficient to support a finding of probable cause. We agree with K.M.

¶ 23   Probable cause exists when the facts known to the officer at the time of the arrest are sufficient for a reasonably cautious person to believe that the arrestee has committed a crime. *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008). The existence of probable cause depends upon the totality of the circumstances at the time of the arrest. *Id.* The court deals with probability when assessing probable cause. *People v. Love*, 199 Ill. 2d 269, 279 (2002).

¶ 24   In the context of tips forming the basis for probable cause, a reviewing court considers the informant's "veracity, reliability, and basis of knowledge." *People v. Sparks*, 315 Ill. App. 3d 786, 792 (2000). The anonymous tip must provide some indicia of reliability; otherwise the police officers are forced to conduct additional investigation to verify the information or may not respond to the tip. *Id.* at 793. Ordinarily, information from a "concerned citizen" is considered more credible than information from a paid informant or a person who provided information for personal gain. *People v. Linley*, 388 Ill. App. 3d 747, 750 (2009).

¶ 25   Recently in *People v. Lopez*, 2018 IL App (1st) 153331, this court analyzed the reliability of a tip of unknown origin. In *Lopez*, the arresting officer received information from another officer about "a DUI driver" in a black Ford Expedition with a partial plate number of "NZ 1." *Id.* ¶ 4. The officer spotted a black Expedition with a plate beginning with "N 211" *Id.* ¶ 5. Although the driver of the Expedition had not committed any traffic violations, the officer turned on his emergency lights and immediately pulled the Expedition over. *Id.* The officer examined the defendant's state identification, determined that it was not valid, and arrested him. *Id.* ¶ 6. The arresting officer did not know the identity of the drunk driver from the tip, nor was he aware of the time frame between the initial report of drunk driving and his traffic stop. *Id.* ¶ 4. The trial court denied defendant's motion to quash the arrest and suppress the evidence. *Id.* ¶ 7.

¶ 26   In reversing the conviction, the appellate court found that "where there is no evidence that the tipster gave a name or contacted the police through an emergency number, 'the tip must be treated as an anonymous one, and its reliability hinges on the existence of corroborative details observed by the police.' " *Id.* ¶ 22 (quoting *People v. Smulik*, 2012 IL App (2d) 110110, ¶ 8).

The court determined that the officer had not observed any details sufficient to corroborate the tip of a drunken driver. *Id.* ¶ 23. Although the officer confirmed the location, direction, make, color, and partial plate of the Expedition from the tip, none of these details indicated that the driver was engaged in criminal activity. *Id.*

¶ 27 The State asks us to assume that the tipster called the 911 dispatch system and thus the caller had some indicia of reliability. However, there is no evidence in the record indicating that the tipster contacted the police through an emergency number. Furthermore, the tipster did not provide a name and therefore must be treated as anonymous. See *id.* ¶ 22. Thus, the tipster's "reliability hinges on the existence of corroborative details observed by the police." (Internal quotation marks omitted.) *Id.*

¶ 28 Here, the anonymous caller only relayed to the police that they saw people entering the residence of 22438 Yates Avenue carrying items such as a television. Nothing in the record suggested that the caller observed these people participate in any unlawful conduct. In fact, it could appear that the people entering into the house were engaging in innocuous behavior. Furthermore, there is no evidence that any effort was made to verify the anonymous tip before the officers attempted to contact the residents of 22438 Yates Avenue. The officers never observed anyone engaged in criminal activity to corroborate the phone call. In fact, the officers did not even see K.M. until they arrested him. Therefore, we find that the tip was uncorroborated and unreliable.

¶ 29 Relying on *People v. Clay*, 349 Ill. App. 3d 24 (2004), K.M. argues that the State lacked probable cause to arrest him. In *Clay*, men fitting the description of "three black males" robbed a currency exchange and in the process shot and killed an United Armored employee. *Id.* at 26. The responding police officers found the defendant's wallet on the sidewalk just outside of the currency exchange. *Id.* Inside the wallet, an officer found identification of the defendant and a temporary permit for a Chevy van registered in the name of another person. *Id.* The police traced the address listed for the van and set up surveillance outside. *Id.* When the defendant left the address, the police stopped the car he was driving, asked his name, and escorted him to the police station, where he was arrested. *Id.* On appeal, the defendant argued that the trial court erred in finding that the police had probable cause to arrest him. *Id.* at 29. In reversing the trial court, the appellate court reasoned that the defendant, a black man, passing by on the sidewalk near the currency exchange around the time of the murder was not enough to support that there was probable cause. *Id.* at 29-30.

¶ 30 We find K.M.'s argument persuasive. Like *Clay*, the evidence showed that K.M. might have engaged in otherwise innocent conduct that just happened to take place in near temporal and physical proximity to a reported crime. Evidence of proximity to the scene of a crime does not generally provide police probable cause to arrest. *Id.* at 29. Other than the unverified call that did not report a crime, the only information provided was the victim's call, and this evidence is insufficient to establish probable cause to arrest K.M.

¶ 31 The State further argues that when the officer knocked on the door, he saw someone looking out of the window but no one answered the door. The State posits that such behavior shows consciousness of guilt, which provided further probable cause to believe that the individuals in the house were evading the police. The State's argument is not persuasive. There are many obvious reasons why minors would not answer a door for a stranger. Furthermore, we are unaware of any case law that provides for imputing guilt to citizens simply because they do not answer when a police officer knocks on the door.

- 6 -

¶ 32    We find Grossman's testimony, that the officers arrested K.M. "[b]ased on the totality of the circumstances, the residential burglary report that [they] had, the description provided by the anonymous caller, and the items recovered," telling as to whether the officers had independent probable cause. His testimony is contrary to the State's position and indicates that the items recovered from the garage and the garbage were indeed a factor in this case. Accordingly, we find that the State did not have independent probable cause to arrest K.M. on his porch.

¶ 33                                    B. Attenuation

¶ 34    Having found that no independent probable cause existed to arrest K.M., we now determine whether Campbell's delivery of the television, K.M.'s arrest, and K.M.'s subsequent confession were attenuated from the initial illegal search.

¶ 35    As noted before, the fourth amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Under the exclusionary rule courts are precluded from admitting evidence that is gathered by a law enforcement violation of the fourth amendment. *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006). The primary purpose of the exclusionary rule is to deter future unlawful police conduct and thus effectuate the guarantee of the fourth amendment against unreasonable searches and seizures. *Illinois v. Krull*, 480 U.S. 340, 347 (1987).

¶ 36    "The fruit-of-the-poisonous tree doctrine is an outgrowth of the exclusionary rule providing that 'the fourth amendment violation is deemed the "poisonous tree," and any evidence obtained by exploiting that violation is subject to suppression as the "fruit" of that poisonous tree.' " *People v. Burns*, 2016 IL 118973, ¶ 47 (quoting *People v. Henderson*, 2013 IL 114040, ¶ 33). Courts have recognized several exceptions to the exclusionary rule. *In re Jarrell C.*, 2017 IL App (1st) 170932, ¶ 24. Those exceptions are the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. *Id.*

¶ 37    The exception at issue here is the attenuation doctrine, under which evidence challenged for a fourth amendment violation is admissible if the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstances. *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2061 (2016). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." *Id.* at ___, 136 S. Ct. at 2061. Our inquiry is guided by the three factors articulated in *Brown v. Illinois*, 422 U.S. 590 (1975). First, we consider the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. *Id.* at 603. Second, we examine "the presence of intervening circumstances." *Id.* at 603-04. Third, we consider "the purpose and flagrancy of the official misconduct." *Id.* at 604.

¶ 38    K.M. argues that the arrest, the television evidence, and the custodial statement were not attenuated from the initial illegal search and should be suppressed. K.M. argues that Grossman's testimony shows that the police relied upon the illegally obtained evidence to convince Campbell to produce the television from her house and as probable cause to justify the arrest. K.M. further asserts that it is unreasonable to think that, when explaining "the situation and case status," the officer would not have mentioned the fact that they had just recovered stolen property from Campbell's garage. The State argues that Campbell voluntarily

produced the television and K.M. The State contends that there is nothing in the record to support respondent's speculation that Grossman told Campbell about the illegally seized evidence or that he exploited it.

### 1. Temporal Proximity

The first factor, temporal proximity between the illegal search and the arrest of K.M., favors suppressing the evidence. Here, the record demonstrates that Grossman and Officer Howard retrieved the television from Campbell on her porch only minutes after illegally searching her garbage and her garage. Furthermore, the subsequent arrest of K.M. was only minutes after the illegal search and moments after Campbell produced the television. There was a minimal lapse of time between the search and the arrest. As such, the first factor weighs in favor of K.M.'s argument for suppression.

### 2. Independent Intervening Event

"An intervening circumstance is one that dissipates the taint of unconstitutional police conduct by breaking the causal connection between the illegal conduct and the [evidence]." (Internal quotation marks omitted.) *People v. Wilberton*, 348 Ill. App. 3d 82, 86 (2004). Where an intervening circumstance has been determined sufficient to break the causal chain it has been newly discovered information, untainted by illegality. *People v. Jackson*, 374 Ill. App. 3d 93, 105 (2007).

The State argues that Campbell's conduct in producing the television was a voluntary act, free from any taint of the illegal search, and constituted an intervening circumstance that provided independent probable cause to seize the television. However, the record belies the State's contention. The record demonstrates that after the illegal search and the recovery of the victim's documents and computer accessories, Grossman's discussion with Campbell on the phone prompted her return home. Upon her return, he then explained to her in person the "situation and case status." The police never broke the causal connection between their illegal search and obtaining the television. The officers never left K.M.'s property, which demonstrates that the taint of the unconstitutional conduct was ongoing at the time that the police made contact with Campbell. Any contact with Campbell during that timeframe was sufficiently a part of the taint including her delivery of the television. We conclude that there was no independent intervening event that broke the causal chain between the illegal search and the discovery of the television. Thus, this factor also weighs in favor of K.M.'s motion for suppression.

### 3. Purpose and Flagrancy of the Official Misconduct

"[A]ttenuation is less likely to be found where the police misconduct in bringing about the illegal arrest is flagrant. Police action is flagrant where the investigation [was] carried out in such a manner to cause surprise, fear, and confusion, or where it otherwise has a 'quality of purposefulness,' *i.e.*, where the police embark upon a course of illegal conduct in the hope that some incriminating evidence *** might be found." *People v. Jennings*, 296 Ill. App. 3d 761, 765 (1998). Here, the police officers illegally searched the curtilage of K.M.'s home twice in a short time span. There was no warrant authorization to search nor was there any indication of circumstances justifying an exception to the search warrant requirement. See *Pitman*, 211 Ill. 2d at 518. Furthermore, the police requested her presence at the home. The record is unclear

what happened once she arrived, however, we can glean from the testimony that the police explained the situation of the case to her and, at some point they asked to search her residence. She retrieved the television from inside the home and produced K.M., who was arrested on the porch. The police had two opportunities to contact Campbell, when they initially arrived at the house and after they received the second call from the victim about the items that were stolen. However, the police only attempted to contact Campbell once they had recovered the items from the garage and garbage reported missing by the victim. The police had no warrant or exigency to be on the property; thus any action the officers had on the property after the second call was akin to embarking "upon a course of illegal conduct in hope that some incriminating evidence *** might be found." *Jennings*, 296 Ill. App. 3d at 765. We determine that this factor weighs in favor of K.M.'s argument for suppression.

¶ 46   Taken together, all the factors weigh in favor of suppressing the evidence. We find that there was no attenuation between the illegal search of property, the officers obtaining the television, and K.M.'s arrest. As such, we hold that the trial court erred in denying the motion for suppression as to the television and to quash K.M.'s subsequent arrest.

¶ 47                          C. Suppression of the Confession

¶ 48   K.M. argues that his confession should be suppressed because of his illegal arrest. "The determination that an illegal arrest has occurred is not dispositive of the issue of the admissibility of a subsequent confession." *People v. Bates*, 218 Ill. App. 3d 288, 297 (1991). Our inquiry is whether the confession was obtained by exploitation of the arrest. *Id.* Evidence obtained after an illegal arrest need not be suppressed if the evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. *Id.*

¶ 49   *Brown* establishes the factors to be considered in determining whether a confession was the product of the illegal arrest. These factors include (1) the proximity in time between the arrest and the confession, (2) the presence of intervening circumstances, (3) the purpose and flagrancy of the police misconduct, and (4) whether *Miranda* warnings were given. *Brown*, 422 U.S. 603-04. The burden of showing redeeming attenuation as to evidence obtained through an illegal arrest is on the prosecution. *People v. White*, 117 Ill. 2d 194, 222 (1987).

¶ 50   In reviewing this issue, we find that the record provides little information about the events after K.M.'s arrest. In order to determine the appropriate course of action on review, "we must consider whether the record before us is sufficiently complete to allow an independent determination on the issue of attenuation." *People v. Ollie*, 333 Ill. App. 3d 971, 985 (2002). There is information lacking from the record that is important for our consideration. The record is silent as to, *inter alia*, K.M.'s testimony about his confession, whether officers other than Grossman were present at K.M's confession, and the duration of K.M.'s confession. After such consideration, we find that we cannot make an independent determination of the admissibility of respondent's confession. Therefore, we find it appropriate to remand the case for an attenuation hearing on this issue. See *People v. Hernandez*, 2017 IL App (1st) 150575 (reviewing an appeal of a remanded attenuation hearing to determine whether the defendant's statements were sufficiently attenuated from the illegal arrest); *People v. Walls*, 220 Ill. App. 3d 564, 580 (1991) (remanding for trial court to conduct attenuation hearing); *People v. Young*, 206 Ill. App. 3d 789, 804-05 (1990) (remanding for attenuation hearing of the defendant's confession upon finding that the defendant had been illegally arrested).

- 9 -

¶ 51                              III. CONCLUSION

¶ 52        For the foregoing reasons, we reverse the judgment of the trial court and remand for further proceedings.

¶ 53        Reversed and remanded with directions.